Creekview of Hugo Association, Inc.,   File No. 19-cv-00487 (ECT/TNL)

   Plaintiff,

v.          **OPINION AND ORDER**

Owners Insurance Company,

   Defendant.

---

Adina R. Bergstrom, Kayla M. Cottier, and Brenda M. Sauro, Sauro & Bergstrom, PLLC, Oakdale, MN, for Plaintiff Creekview of Hugo Association, Inc.

Brock P. Alton, Gislason & Hunter LLP, Minneapolis, MN, for Defendant Owners Insurance Company.

---

The multi-building Creekview of Hugo Townhomes complex (the "Property") was damaged by a large wind and hail storm on June 11, 2017. At the time of the storm, the Property was insured under a policy issued by Defendant Owners Insurance Company. Owners and the Property's homeowners association, Plaintiff Creekview of Hugo Association, Inc. ("Creekview"), dispute the amount currently owed under the policy, even following an appraisal conducted pursuant to the policy and Minnesota statute. Creekview filed a motion in Washington County District Court seeking confirmation of the appraisal award and an order requiring Owners to pay the $374,838.63 Creekview contends was still

owed under the appraisal,[1] plus pre-award and post-award interest, costs, and fees. Owners removed to federal court on the basis of diversity jurisdiction, which exists here because the Parties are of diverse citizenship and the amount in controversy well exceeds the $75,000 threshold.[2] *See* ECF No. 1 at 3–4; 28 U.S.C. § 1332(a). Creekview's motion will be granted in part and denied in part.

I

The Parties seem to agree on the broad outline of the facts: The Property was damaged by wind and hail on June 11, 2017. Mem. in Supp. at 3 [ECF No. 4]; Mem. in Opp'n at 3–4 [ECF No. 9]. At the time, Creekview was covered under an insurance policy issued by Owners that covered the replacement cost of just such a covered loss. Mem. in Supp. at 3; Mem. in Opp'n at 3–4; *see also* Cottier Aff. Ex. A at BP 00 02 01 87 ("Policy") at 12 [ECF No. 5-1 at 47–67].

The policy provides that, in general, Owners "will not pay on a replacement cost basis for any loss or damage . . . [u]ntil the lost or damaged property is actually repaired or replaced; and . . . [u]nless the repairs or replacement are made as soon as reasonably

---

[1]    After Creekview filed its motion, Owners made a partial payment that brings the amount Creekview says is currently owed to $354,564.68. *See* Reply Mem. at 19 [ECF No. 15].

[2]    Because of the procedural history of this case, no traditional complaint was filed; rather, Creekview filed a motion to confirm the appraisal award in state court, pursuant to state law, and Owners removed. The Court therefore treats Creekview's motion to confirm the appraisal award as the complaint for the purpose of determining whether jurisdiction exists. *See* Report and Recommendation at 6, *Eden Homeowners Assoc., Inc. v. Am. Fam. Mut. Ins. Co.*, No. 15-cv-3527 (RHK/HB) (D. Minn. Dec. 22, 2015), ECF No. 29, *R&R adopted* (D. Minn. Jan. 11, 2016), ECF No. 30.

possible after the loss or damage." Policy at 12–13. But even if the insured initially "make[s] a claim for loss or damage . . . on an actual cash value basis instead of on a replacement cost basis," it may—and here, Creekview did—subsequently "make a claim on a replacement cost basis" if it does so timely. *Id.* at 12. When a claim proceeds in that manner, Owners follows a two-step claims-payment process: first, it issues payment for the actual cash value of the loss—that is, the replacement cost minus depreciation—and then, after repairs are complete, it issues the amount withheld for depreciation, called the "recoverable depreciation" or "depreciation holdback." Mem. in Supp. at 3 (citing Policy at 12); *see also* Mem. in Opp'n at 4. The policy caps Owners' obligation on replacement cost at either the amount actually spent to repair or replace the damaged property or the cost to repair or replace the damaged property with other property of comparable quality and used for the same purpose, whichever is less. Policy at 13.

Creekview opened a claim with Owners on June 19, 2017. Cottier Aff. Ex. B [ECF No. 5-1 at 69]. Owners retained an independent adjusting firm, Moe & Nevins, which determined that the replacement cost value of the damage was $1,196,299.26. *See* Cottier Aff. Ex. C [ECF No. 5-1 at 71]. On August 29, 2017, Owners issued Creekview a check for $832,684.96—to cover the actual cash value of the loss, as determined by its own adjuster, minus Creekview's $25,000 deductible—and confirmed that an additional payment for recoverable depreciation could be paid after Creekview completed its repairs. Cottier Aff. Ex. D [ECF No. 5-1 at 73–76]. But Creekview's repair contractor, Lincoln Hancock Restoration, estimated that the replacement cost value of the damage was $1,654,913.44, which was around $450,000 more than the replacement cost value assigned

by Moe & Nevins.[3]  When the Parties failed to agree on the amount of loss, Creekview

invoked the policy's appraisal clause, which provides:

> **2.      Appraisal**
> If we and you disagree on the amount of loss, either may make
> written demand for an appraisal of the loss.  In this event, each
> party will select a competent and impartial appraiser.  The two
> appraisers will select an umpire.  If they cannot agree, either
> may request that selection be made by a judge of a court having
> jurisdiction.  The appraisers will state separately the amount of
> loss.  If they fail to agree, they will submit their differences to
> the umpire.  A decision agreed to by any two will be binding.

Policy at 11; Alton Decl. Ex. 2 [ECF No. 10-1 at 2].  Creekview's request was dated

May 25, 2018, but was not received by Owners until July 3, 2018.  *Compare* Alton Decl.

Ex. 2 *with* Alton Decl. Ex. 3 [ECF No. 10-1 at 3].  No evidence in the record suggests the

reason for this lag, although at oral argument Owners' counsel stated that it was the result

of a delay between when he received the request and when he transmitted it to Creekview.

On July 13, 2018, Owners requested that Creekview provide proof of loss, and

reiterated that request several more times before Creekview provided an itemized and

sworn proof-of-loss statement on October 11, 2018.  *See* Alton Decl. Exs. 3–7 [ECF

No. 10-1 at 3–93].  On October 30, 2018, the appraisal panel—the appraiser each Party

selected, along with the umpire selected by those two appraisers—conducted the appraisal

---

[3]      Creekview says that the difference in the replacement cost values calculated by
Lincoln Hancock and Moe & Nevins is $442,744.58.  Mem. in Supp. at 5.  And this same
figure appears in a chart filed by Creekview comparing the dueling repair estimates.  *See*
Cottier Aff. Ex. C.  But a different row on that same chart also lists the difference as
$458,614.18.  There is no explanation for this discrepancy.  Subtracting Moe & Nevins's
estimate of $1,196,299.26 from Lincoln Hancock's estimate of $1,654,913.44 yields a
difference of $458,614.18.  This difference is immaterial in light of the eventual appraisal
award.

and awarded Creekview a total replacement cost of $1,499,354.52, with an actual cash value of $1,124,515.89.  Cottier Aff. Ex. F [ECF No. 5-1 at 80–81].  The panel transmitted the appraisal award to the Parties that same day.  Cottier Aff. Ex. G [ECF No. 5-1 at 83].  The award listed an actual cash value and a replacement cost value for each of the eighteen buildings at issue, as well as for "general conditions" at the Property, but did not otherwise itemize values for particular types of damage (*e.g.*, it did not identify specific values for elements of roofing, gutters, siding, etc., either at specific buildings or for the Property as a whole).  Cottier Aff. Ex. F.

Creekview understood the policy to require Owners to make full payment within five days after the appraisal award was issued, *see* Mem. in Supp. at 5 (citing Minn. Stat. § 72A.201, subd. 5(5) and policy endorsements specific to Minnesota); when Creekview had received no further payment within that time, it sent a letter dated November 9, 2018, requesting that Owners pay the total replacement cost plus pre-award and post-award interest, *see* Cottier Aff. Ex. H [ECF No. 5-1 at 85–86].  Creekview's position was that it was entitled to the total replacement cost because all repairs had been completed—or "substantially complete[d]"—at the time of the appraisal.  Mem. in Supp. at 5–6; Elert Decl. ¶ 3 [ECF No. 17].  Owners evidently disputed that point.  *See* Mem. in Opp'n at 5.  At the appraisal, Owners' adjuster had determined that, contrary to Creekview's assertions, some repairs had not yet been completed.  Alton Decl. ¶ 10 [ECF No. 10].  On November 16, 2018, it mailed Creekview a check for $266,830.93, representing the difference between the actual cash value awarded by the appraisal panel and the payment previously issued by Owners.  *See* Cottier Aff. Ex. I [ECF No. 5-1 at 88–89].  In the letter

enclosing the check, Owners requested that Creekview not deposit the check "pending the potential modification by the appraisal panel." *Id.* Ultimately, the award was not modified, and on November 29, 2018, Owners advised that Creekview could deposit the check. *See* Cottier Aff. Ex. J [ECF No. 5-1 at 91–95]. That still left Creekview without the $374,838.63 portion of the appraisal award representing recoverable depreciation.

In furtherance of its position that all repairs at the Property had been completed, Creekview provided Owners with a copy of a December 19, 2018 invoice from Lincoln Hancock describing a total of $1,499,354.52 in "[s]torm damage repairs completed per the appraisal award," and seeking payment for the unpaid balance of those repairs. Cottier Aff. Ex. E [ECF No. 5-1 at 78]; Mem. in Supp. at 6; Mem. in Opp'n at 5. Moe & Nevins undertook reinspection in early January 2019. Alton Decl. Ex. 9 [ECF No. 10-1 at 103–04]. Following the reinspection, it exchanged several emails with Creekview's contractor about a number of repairs it did not believe had been completed, although Moe & Nevins's specific concerns were unclear and it was, in several respects, unresponsive to Creekview's contractor's requests for clarification. *See* Alton Decl. Ex. 8 at 1–6 [ECF No. 10-1 at 94].

Meanwhile, on February 5, 2019, Creekview filed a motion in Washington County District Court to confirm the appraisal award and for entry of a judgment awarding interest, costs, and fees. ECF No. 3. Two days later, on February 7, 2019, Moe & Nevins issued a supplemental report to Owners documenting that, in its opinion, several repairs remained incomplete. Alton Decl. Ex. 9. It had been unable to reinspect the roofing repairs at the Property due to weather conditions. Alton Decl. Ex. 10 [ECF No. 10-2]. On February 27,

2019, with communications continuing among the Parties, Owners' adjuster, and Creekview's contractor, Owners removed this case to federal court. ECF No. 1.

As the Parties continued briefing Creekview's motion in federal court, Owners issued a partial depreciation payment of $20,273.95 on March 20, 2019, bringing the amount of unpaid recoverable depreciation to $354,564.68. Bergstrom Aff. Ex. R [ECF No. 16-1 at 159–68]. That payment was based on Moe & Nevins's reinspection and its itemized calculations, and it did not include any depreciation holdback relating to repairs that Owners did not believe had been completed or that, due to weather delays, it had not yet been able to verify to its satisfaction. *Id.*; *see also* Alton Decl. Ex. 10; Mem. in Opp'n at 6; Elert Decl. Ex. B [ECF No. 17-1 at 18–128]. For example, the supplemental payment did not include payment for any depreciation holdback for roofing or roofing components, satellite-dish recalibration, two overhead doors, two windows, some number of aluminum gutters and downspouts, siding on one building, or chimney caps. Elert Decl. Ex. A at 4–5 [ECF No. 17-1 at 2–16]. Creekview's contractor maintains that many of these repairs have indeed been completed, but the record is at least ambiguous as to whether some items have been repaired or replaced to Owners' satisfaction. *Id.* Creekview now seeks an order awarding it the unpaid balance of the entire appraisal award, plus interest, costs, and fees. ECF No. 18.

II

As an initial matter, the Parties disagree about which response brief the Court should consider with respect to Owners' opposition to the motion. When Owners removed, it filed Creekview's motion papers in federal court, but not its own opposition to Creekview's

motion, which it had filed in state court the day before it removed. *See generally* ECF No. 1; Bergstrom Aff. Ex. P at 28 [ECF No. 16-1 at 2–28]. Accordingly, on March 11, 2019, the Court ordered Owners to file "any opposition to Creekview's motion on or before . . . March 13, 2019." ECF No. 8 at 2. Owners filed its opposition by that date, but it was not the same opposition it had filed in state court. *Compare* Mem. in Opp'n [ECF No. 9] (federal-court brief) *with* Bergstrom Aff. Ex. P [ECF No. 16-1 at 2–28] (state-court brief). The differences, however, are minimal, and consist primarily of one new exhibit and one new sentence describing Moe & Nevins's assessment, based on its reinspection, that only a small portion of the depreciation holdback could be paid as of late March 2019—after Owners' state-court opposition brief had been filed. *See* Mem. in Opp'n at 3, 6; Alton Decl. Ex. 10. Creekview suggests that these minimal updates were improper and requests that the Court strike Owners' federal-court brief, deciding the motion based only on the arguments and evidence contained in its state-court filings. Reply Mem. at 6–7 [ECF No. 15].

The Court declines Creekview's request and will consider Owners' federal-court filings made in connection with this motion. Owners may have created some procedural confusion when it did not file its original brief in federal court at the same time it removed the case, but the Court did not explicitly order Owners to file the exact same brief it had filed in state court, and Owners therefore is not in violation of the Court's briefing order. *See* ECF No. 8 at 2 (ordering that "Owners must file *any* opposition to Creekview's motion" by the deadline (emphasis added)). Furthermore, this motion presents a fairly unusual situation in which highly pertinent facts—how much Owners has paid Creekview,

and when, and why—have continued to develop in the months since Creekview first filed its motion to confirm the appraisal award in state court. Creekview acknowledges as much—it filed the March 20 check constituting a partial depreciation payment and recent email correspondence as exhibits to its reply. *See* Bergstrom Aff. Ex. R; Bergstrom Aff. Ex. S [ECF No. 16-1 at 170–72]; Bergstrom Aff. Ex. V [ECF No. 16-1 at 182–91]. To the extent that Owners' opposition brief includes changes based on developments that occurred after it filed its state-court brief, it is more consistent with "the just, speedy, and inexpensive determination" of this matter to consider that information at this time. Fed. R. Civ. P. 1.

## III

This matter is before the Court on the basis of diversity jurisdiction. Minnesota's substantive law therefore applies. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). Because the Court's role in this diversity action is to interpret the state law of Minnesota, it is bound by the decisions of the Minnesota Supreme Court. *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006). "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue." *Continental Cas. Co. v. Advance Terrazzo & Tile Co.*, 462 F.3d 1002, 1007 (8th Cir. 2006). When the decisions of a state's intermediate appellate court present "the best evidence of what state law is," those decisions constitute persuasive authority that this Court will follow. *Id.*

## A

The Parties dispute whether, under Minnesota law, appraisal awards are reviewed under the Minnesota Uniform Arbitration Act (as Creekview contends) or under a system

of common-law arbitration that survives from an era before Minnesota's adoption of the uniform act (as Owners contends). *See* Mem. in Supp at 7; Mem. in Opp'n at 6–9. The resolution of that dispute is potentially relevant to, if not necessarily dispositive of, other arguments the Parties make with respect to Creekview's motion, as discussed below. The specifics of those other arguments can be set aside for the moment to focus on the broader question of whether the Minnesota Uniform Arbitration Act applies.

Owners strenuously argues that the Minnesota Uniform Arbitration Act does not apply to the review and confirmation of appraisal awards. Mem. in Opp'n at 7–14. That position conflicts with numerous decisions by the Minnesota Court of Appeals spanning more than three decades. *See, e.g.*, *David A. Brooks Enterps., Inc. v. First Sys. Agencies*, 370 N.W.2d 434, 435 (Minn. Ct. App. 1985) ("Since appraisal awards are to be treated as arbitration awards, the same standard of review applies." (citation omitted)); *Vesledahl Farms, Inc. v. Rain & Hail Ins. Serv., Inc.*, No. C2-96-1049, 1996 WL 722101, at *2 (Minn. Ct. App. 1996) ("The appraisal provision of the parties' contracts necessitated that the district court construe the contract to provide for arbitration." (citing *David A. Brooks*)); *QBE Ins. Corp. v. Twin Homes of French Ridge Homeowners Ass'n*, 778 N.W.2d 393, 398 (Minn. Ct. App. 2010) ("Appraisal decisions are subject to Minn. Stat. § 572.08–.30 (2008), the arbitration statute." (citing *David A. Brooks*)); *K & R Landholdings, LLV v. Auto-Owners Ins.*, 907 N.W.2d 658, 664 (Minn. Ct. App. 2018) (rejecting the argument that appraisals are not arbitrations governed by the Minnesota Arbitration Act). The Eighth Circuit has recognized as much, observing in its recent decision in *Herll v. Auto-Owners*

*Insurance Co.* that "[t]he Minnesota Uniform Arbitration Act applies to the review and confirmation of appraisal awards in insurance disputes." 879 F.3d 293, 295 (8th Cir. 2018).

That is not to say that Owners is unreasonable in arguing that appraisal awards are a form of common-law arbitration not controlled by the Minnesota Uniform Arbitration Act. It cites, for example, *Dufresne v. Marine Insurance Co.*, a 1923 Minnesota Supreme Court decision evaluating a challenge to the validity of an appraisal against the procedural rules that applied to common-law arbitrations. Mem. in Opp'n at 9 (citing 196 N.W. 560, 561 (Minn. 1923)). Owners also relies heavily on a footnote in a dissent authored by Justice G. Barry Anderson in *Poehler v. Cincinnati Insurance Co.* distinguishing appraisals from arbitration. Mem. in Opp'n at 11 (citing 899 N.W.2d 135, 148 n.4 (Minn. 2017) (Anderson, J., dissenting) ("Often, and unfortunately with resulting confusion, the terms 'appraisal' and 'arbitration' are used interchangeably." (citation omitted))). But the majority decision in *Poehler* necessarily rejected the distinction Justice Anderson identified. *See* 899 N.W.2d at 140–41. In the absence of any Minnesota Supreme Court decision from the modern era specifically addressing whether appraisal awards are reviewed as a form of common-law arbitration or under the Minnesota Uniform Arbitration Act, the best evidence available is the long line of precedent from the Minnesota Court of Appeals and the Eighth Circuit's reliance on those state-court decisions. This Court will not deviate from that authority.

B

The Parties do not seem to seriously disagree that, at some point, Owners must pay Creekview the $354,564.68 in depreciation holdback that remains unpaid following the

supplemental payment Owners issued in March 2019.  Nor could Owners reasonably contend otherwise.  After all, subject to the policy limit, the policy caps Owners' payment obligation at either the replacement cost of the Property or the amount Creekview "actually spen[t] that is necessary to repair or replace the . . . damaged property," whichever amount is less.  Policy at 13.  The appraisal determined that the Property's replacement cost totaled $1,499,354.52.  Cottier Aff. Ex. F.  And that amount is at least equal to, and (if Creekview elects to address any repairs not covered by the appraisal award) possibly less than, whatever amount Creekview may ultimately spend on repairs.  *See* Cottier Aff. Ex. E.  The undisputed evidence establishes that by December 29, 2018, Creekview had already spent up to the entire appraisal award repairing the Property.  *Id.*  Any further repairs by Creekview would be at its own expense.  Thus, regardless of whether Creekview does any more work making the repairs Owners says remain undone, Owners will be on the hook for the appraisal award's full replacement cost sooner or later.  But whether Owners must pay sooner or whether it may pay later is disputed here.  Specifically, the Parties disagree as to whether the policy's trigger for payment of replacement cost value—that is, the actual repair or replacement of the damaged property, *see* Policy at 13—has occurred.

It has.  Suppose for a moment that Owners is correct that, for example, two overhead doors have not been replaced.  *See* Elert Decl. Ex. A at 4.  It does not want to pay Creekview for what Owners believes is the replacement cost of those doors until after those doors have in fact been replaced, and it argues that it is not required to do so under the policy.  But the appraisal award did not indicate that those specific doors were included in the replacement cost it awarded and did not itemize a replacement cost for those doors.  Cottier Aff. Ex. F.

Rather, it awarded a single, aggregated replacement cost and a single, aggregated actual cash value for each affected building at the Property, with separate values awarded for general conditions at the Property. *Id.* Creekview has now spent at least the entire amount of the replacement cost awarded to repair the Property. Cottier Aff. Ex. E. Neither the appraisal award nor the policy permits Owners—or the Court—to speculate about which repairs the appraisal award was intended to cover, or in what amounts, as Owners' argument here would require. *See Herll v. Auto-Owners Insurance Co.*, No. 15-cv-3104 (MJD/FLN), 2018 WL 4759833, at *5 (D. Minn. Oct. 2, 2018). Accordingly, Owners must now pay the unpaid balance of the replacement cost value awarded at appraisal.

## C

Owners admits that, under *Poehler*, 899 N.W.2d 135, it owes Creekview pre-award interest. *See* Mem. in Opp'n at 14. Under Minn. Stat. § 549.09, subd. 1(b), "[e]xcept as otherwise provided by contract or allowed by law," pre-award interest on an appraisal award begins accruing "from the time of the commencement of the action or a demand for arbitration, or the time of a written notice of claim, whichever occurs first." That statute further provides that interest generally will not be awarded on awards for future damages. *Id.* With respect to pre-award interest, the Parties dispute the date on which interest began to accrue and the amount on which it accrued.

## 1

The Parties agree that because Creekview commenced this action after the appraisal award, the date on which this action was commenced could not possibly be the correct start date for the pre-award interest calculation. *See* Mem. in Supp at 13; Mem. in Opp'n at 16.

Accordingly, the only possible start dates are either the date on which Creekview submitted written notice of its claim or the date on which it demanded appraisal. *See* Minn. Stat. § 549.09, subd. 1(b). The Parties disagree about the precise date on which Creekview might be said to have demanded appraisal—whether May 25, 2018, when it sent Owners a demand for arbitration; or July 3, 2018, when Owners received it; or some later time once the demand became (in Owners' view) timely. *See* Alton Decl. Exs. 2–3; Mem. in Opp'n at 19–20. Because Creekview provided Owners with written notice of its claim before the earliest possible date on which it could have been found to have demanded appraisal, the Court need not pinpoint the exact date on which its demand was made.

The statute does not define what it means to give "written notice of claim." Creekview contends it submitted its "written notice of claim" to Owners about a week after the storm, on June 19, 2017, when Creekview's insurance manager informed Owners by email that it needed to open a claim stemming from hail damage that occurred on June 11, 2017.[4] *See* Cottier Aff. Ex. B; Reply Mem. at 13. Owners contends that Creekview did not provide "written notice of claim" until more than a year later, on October 11, 2018, when it provided Owners a proof of loss. *See* Alton Aff. Ex. 7; Mem. in Opp'n at 20.

Minnesota courts have not defined precisely what constitutes a "written notice of claim" in the context of an insurance dispute such as this one, again leaving this Court in the position of predicting how the Minnesota Supreme Court would resolve that issue. *See*

---

[4] Owners incorrectly characterizes Creekview as seeking interest from the date of loss. Mem. in Opp'n at 20. Creekview states explicitly that it seeks interest from the date on which it emailed Owners to open a claim for hail damage. Mem. in Supp. at 13; Reply Mem. at 13.

*Continental Cas. Co.*, 462 F.3d at 1007. Minnesota courts have observed in other contexts that although § 549.09 "does not prescribe the content of the notice," such notice is "sufficient . . . when an insurer 'bec[omes] aware of [the insured's] injuries' via a letter," because that communication sparks the insurer's "affirmative duty to inquire into the particular benefits that the [insureds] were claiming and to provide [them] with a position on their claim." *Indep. Sch. Dist. 441 v. Bunn-O-Matic Corp.*, No. C0-96-594, 1996 WL 689768, at *10 (Minn. Ct. App. Dec. 3, 1996) (second, third, and fourth alteration in original) (quoting *Higgins v. J.C. Penney Cas. Ins. Co.*, 413 N.W.2d 189, 191–92 (Minn. Ct. App. 1987)). Various decisions within the District of Minnesota have considered what constitutes "written notice of claim" for purposes of pre-judgment or pre-award interest, concluding that the phrase unambiguously and "simply means a demand for payment (or other similar assertion) contained in a writing." *Gen. Mills Ops., LLC v. Five Star Custom Foods, Ltd.*, 845 F. Supp. 2d 975, 978 (D. Minn. 2012); *see also Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc.*, No. 04-cv-4699 (JRT/FLN), 2008 WL 4527816, at *9 (D. Minn. Sept. 29, 2008) ("Minnesota courts have frequently described the required notice under Minn. Stat. § 549.09 as a demand for payment." (citations omitted)).

It is clear that, under Minnesota law, a written notice of claim need not identify a specific amount of damages sought to trigger pre-award interest; rather, the issue is whether the defendant "could have determined the amount of its potential liability from a generally recognized objective standard of measurement." *Bunn-O-Matic Corp.*, 1996 WL 689768, at *10 (quoting *Solid Gold Realty, Inc. v. Mondry*, 399 N.W.2d 681, 684 (Minn. Ct. App. 1987)). In the unpublished *Bunn-O-Matic* decision, the Minnesota Court of Appeals

considered the sufficiency of notice provided in a pre-suit letter from the plaintiff school district's insurer to Bunn-O-Matic, the manufacturer of a defective electric coffeemaker. *See id.* In the letter, the insurer informed Bunn-O-Matic that a defective coffeemaker had caused the plaintiff's high-school building to be destroyed by fire, and that the damages were not yet undetermined but that a formal demand would be forthcoming when a final calculation of damages was available. *Id.* The Minnesota Court of Appeals found that this notice was sufficient to trigger pre-judgment interest because it advised Bunn-O-Matic "of the claim against it and the extent of damages"—the destruction of the school—from which Bunn-O-Matic "could have determined its potential liability." *Id.*

Here, Creekview's insurance manager informed Owners on June 19, 2017:

> Good afternoon,
>
> I need to open a claim for this community. Below are the details:
>
> DOL: 6/11/17
> Cause: Hail
>
> Please have the assigned adjustor contact me and let me know the claim number once you have record of it.
>
> Thank you[.]

Cottier Aff. Ex. B. The only reason an insured would open a claim with its insurance carrier is that it believed its loss was covered under the applicable policy and that it claimed some amount of payment from the insurer for the damage. As in *Bunn-O-Matic*, Creekview's email notified Owners of its loss, the fact that it was making a claim under the policy, and the cause of the damage (hail). Though general, the email's reference to

the "community" at least suggested that the extent of the damages was not confined to a single building but to the townhome complex as a whole, similar to the extent of damage described by the insured's letter in *Bunn-O-Matic*. *See* 1996 WL 689768, at \*10. From that information, Owners could have determined its potential liability. *See id.* Consequently, Creekview's June 19, 2017 email to Owners opening the claim constituted a demand for payment that is sufficiently specific under *Bunn-O-Matic*.

This conclusion is further informed by the Minnesota Supreme Court's decision in *Poehler*, which cited favorably to a Report and Recommendation issued by Magistrate Judge Hildy Bowbeer in *Eden Homeowners Association, Inc. v. American Family Mutual Insurance Co.*, No. 15-cv-3527 (RHK/HB) (D. Minn. Dec. 22, 2015), ECF No. 29 (hereinafter "*Eden* R&R"), *R&R adopted* (D. Minn. Jan. 11, 2016), ECF No. 30. *See Poehler*, 899 N.W.2d at 143. *Poehler* observed that in *Eden*, Magistrate Judge Bowbeer recommended awarding pre-award interest "from the date on which the insured provided written notice of its claim to the insurer." *Id.* (citing *Eden* R&R at 16). The Report and Recommendation does not state explicitly that it was using the date on which the plaintiff informed its insurer that it was opening a claim, but given that Magistrate Judge Bowbeer recommended awarding pre-judgment interest beginning only two days after the date of loss, that is the obvious conclusion. *See Eden* R&R at 2 (identifying date of loss as August 6, 2013), 16 (using August 8, 2013, the date on which the plaintiff "gave written notice of its claim" to its insurer as the start date for pre-award interest). No party in *Eden* objected to Magistrate Judge Bowbeer's Report and Recommendation, and Judge Richard H. Kyle accepted it in full. *Poehler*'s favorable treatment of *Eden* with respect to the start

date for pre-award interest in this respect is not binding on this Court because there, the Minnesota Supreme Court held that "the triggering-event issue . . . [was] not properly before [it]", and thus *Poehler* did not have reason to either adopt or reject *Eden*'s determination that an insured's notice to an insurer that it was opening a claim constituted "written notice of claim" for the purpose of calculating pre-award interest. *Poehler*, 899 N.W.2d at 140 n.2. But particularly when considered alongside the analysis of the Minnesota Court of Appeals in *Bunn-O-Matic*, the Minnesota Supreme Court's favorable discussion of *Eden*'s approach represents persuasive authority.

A different rule or result would invite arbitrary line-drawing by courts. Because Minnesota courts have been clear that a party need not demand a specific dollar amount to trigger pre-award interest, expecting Creekview to do more than inform Owners that it was opening a claim for hail damage but something short of making a specific monetary demand would require the Court to identify some intermediate level of specificity not suggested by the statute, Minnesota case law, or even Owners' brief. *Cf. Buskey v. Am. Legion Post #270*, 910 N.W.2d 9, 15, 17 (Minn. 2018) (rejecting defendant's argument that the Minnesota Civil Damages Act's actual-notice provision requires that a defendant have notice of "certain indispensable facts" in order to have "'[a]ctual notice of sufficient facts reasonably to put the [defendant] on notice of a possible claim,'" saying that, "[h]ad the Legislature wanted to specify and mandate the vital components of actual notice . . . it could have done so" (quoting Minn. Stat. § 340A.802, subd. 2) (other citation omitted)). Should Creekview have provided an estimated range of damages? Would a range of somewhere between $50,000 and $5 million have been sufficiently specific to trigger pre-

award interest?  Should it have set a floor on its estimated damages, even if it could provide no estimated ceiling on damages yet to be determined?  If that would be enough, then didn't Creekview, by opening a claim under a policy with a $25,000 deductible, implicitly tell Owners that it was claiming at least $25,000.01 in damages, with an upper end that was yet unknown?  This line of questions may seem absurd, but if Owners is correct that opening a claim under the policy is not sufficient to trigger pre-award interest, insureds would be incentivized to make absurdly nonspecific and unsupported placeholder demands which courts would then be required to assess under Minn. Stat. § 549.09, without any meaningful standards against which to assess them.  A better approach, because it is less likely to result in inconsistent and arbitrary adjudications and is truer to Minnesota case law addressing the triggering date under Minn. Stat. § 549.09, is that pre-award interest began accruing when Creekview opened its claim, because that notice triggered Owners' "affirmative duty to inquire into the particular benefits that [Creekview was] claiming and to provide [it] with a position on [its] claim," *Bunn-O-Matic Corp.*, 1996 WL 689768, *10 (quoting *Higgins*, 413 N.W.2d at 191–92), and allowed Owners to "determine[] the amount of its potential liability from a generally recognized objective standard of measurement," *id.* at *10 (quoting *Solid Gold Realty*, 399 N.W.2d at 684), such as through claim adjustment.

Accepting Owners' argument would also encourage gamesmanship by insurers. Here, the policy only requires Creekview to submit proof of loss if and when requested by Owners.  Policy at 11 (in a section entitled "Duties In The Event Of Loss Or Damage," requiring Creekview to, "[a]t [Owners'] request, give us complete inventories of the

damaged and undamaged property. Include quantities, costs, values and amount of loss claimed."). If Owners' interpretation of Minn. Stat. § 549.09 is correct, and an insured must submit a proof of loss before pre-award interest is triggered, policy provisions like this one would allow insurers to largely control whether and when pre-award interest is triggered by a written notice of claim from an insured that is in full compliance with the terms of its policy. By simply not asking for proof of loss, or delaying such a request, Owners could substantially delay, or possibly avoid altogether, its pre-award interest obligations. That result would be inconsistent with the twin purposes of pre-award interest: compensating the plaintiff for the loss of use of the money and promoting settlement. *Burniece v. Ill. Farmers Ins. Co.*, 398 N.W.2d 542, 544 (Minn. 1987).

As Owners points out, at least two decisions in this District have reached the opposite result, finding that similar communications to insurers do not constitute written notice of claim under Minn. Stat. § 549.09. The district court in *Herll* concluded that an email to the plaintiff's insurance carrier "simply gave notice to Defendant that [Plaintiffs] believed they had a claim under their homeowner's policy, and . . . initiate[d] the claims process. Plaintiffs did not demand payment in the email as it is clear no determination was made that they had a covered loss at that time." 2018 WL 4759833, at *4. *Herll* relied in part on the decision following remand in *Housing and Redevelopment Authority of Redwood Falls v. Housing Authority Property Insurance* ("*Redwood II*"), where the court held that pre-award interest began to accrue on the date the insured demanded appraisal because the insured's email and signed property-loss notice "d[id] not demand any payment" and because there was no other evidence in the record of the first date on which

such a demand was made. *Redwood II*, No. 14-cv-4741 (PAM/HB), 2017 WL 5197135, at \*2 & n.2 (D. Minn. Nov. 8, 2017). But neither *Redwood II* nor *Herll* cited *Bunn-O-Matic*, and *Herll* did not cite *Poehler*'s seemingly favorable treatment of *Eden*, both of which this Court finds to be persuasive in predicting how the Minnesota Supreme Court would likely interpret Minn. Stat. § 549.09's reference to a "written notice of claim." Accordingly, pre-award interest will be awarded for the time period beginning June 19, 2017.

2

Creekview argues that pre-award interest should be calculated on the total appraisal award. Mem. in Supp. at 12. Owners argues, first, that interest should not be awarded on depreciation holdback because that money is not owed until repairs are completed; and second, that its initial payment of $832,684.96 should also be excluded in calculating pre-award interest. Mem. in Opp'n at 20–23. As to Owners' first argument, the Minnesota Supreme Court's decision in *Poehler* requires that the depreciation holdback be included in the interest computation. But as to its second argument, the purposes of pre-award interest under Minn. Stat. § 549.09 would not be served by awarding Creekview interest on Owners' initial payment, and that amount will be excluded from the computation.

As explained above, all repairs awarded by the appraisal panel—that is, repairs totaling the nonitemized replacement value of the Property, as determined at appraisal— are now complete. But even if that were not the case, the Minnesota Supreme Court made clear in *Poehler* that a contract provision governing when payment on a claim is due does not limit the availability of pre-award interest. 899 N.W.2d at 141–42. Even though

21

*Poehler* dealt with a different iteration of a loss-payment provision—one that provided that the insurer need not pay any portion of the loss until five days after the appraisal award, rather than, as here, that the insured need not pay on the replacement cost value until after repairs are completed—the Minnesota Supreme Court held explicitly that the loss-payment provision (like the one here) "governs only when a covered loss is payable; it does not speak to when interest begins to accrue, which can be months or even years before the payment is due." 899 N.W.2d at 143. And *Poehler* made clear that, absent contractual language explicitly limiting pre-award interest on appraisal awards, a general loss-payment provision has no bearing on the pre-award-interest calculation. *Id.*[5]

But Owners is correct that its pre-appraisal payment of $832,684.96 should be excluded from the pre-award interest calculation once that payment was made to Creekview.[6] By statute, pre-award interest is owed only on pecuniary damages. Minn. Stat. § 549.09, subd. 1(b). As *Redwood II* explained, pecuniary damages—that is, "compensation for loss that is 'estimated and monetarily compensated'"—are reduced by the payments the insurer made to its insured before Minn. Stat. § 549.09 is triggered. 2017 WL 5197135, at *4 (quoting Black's Law Dictionary 471, 474 (10th ed. 2014)). That

_____

[5] Three other decisions in this District have reached the opposite conclusion, one before *Poehler*, and two after. *See Herll*, 2018 WL 4759833, at *4–5; *Redwood II*, 2017 WL 5197135, at *3; *Eden* R&R at 16. As reasonable as these decisions are, they do not discuss, and in the Court's view do conflict with, the binding holding in *Poehler*.

[6] Of course, the partial payment can reduce Owners' pre-award interest obligation once it was made to Creekview. But between June 19, 2017, when Creekview's written notice of its claim triggered pre-award interest, and August 29, 2017, when Owners made its initial payment, interest accrued on the full amount ultimately awarded at appraisal.

conclusion makes sense in light of the purposes of the pre-award-interest statute. Pre-award interest available under that statute is not punitive in nature. *Fette v. Peterson*, 406 N.W.2d 594, 596 (Minn. Ct. App. 1987); *cf. Burniece*, 398 N.W.2d at 544 (comparing Minn. Stat. § 549.09 to the Minnesota No Fault Act, for which interest is available on overdue payments and has, in part, a punitive purpose). Rather, such interest serves two purposes: (1) compensating the plaintiff for the loss of use of the money, and (2) promoting settlement. *Burniece*, 398 N.W.2d at 544. Once Owners made its initial payment to Creekview, Creekview had that money in hand and needs no compensation for the loss of its use. Furthermore, crediting any initial payment against the amount on which pre-award interest accrues better promotes settlement than does allowing interest to accrue on amounts that have already been paid. If the law permitted the latter—that is, if prompt partial payment of the undisputed portion of a disputed claim had no effect on the pre-award-interest calculation—insurers would be disincentivized from making such payments, and insureds would have all the more incentive to litigate, rather than settle, even narrow disputes. Further support for excluding Owners' initial payment from the calculation is found in *Poehler*. There, the Minnesota Supreme Court explicitly declined to rule on the issue of whether pre-award payments should be excluded from a pre-award-interest calculation, but it did describe the district court's decision in that case to award interest on the entire award as "anomalous." *Poehler*, 899 N.W.2d at 145 n.4.

D

In Minnesota, post-award interest accrues annually on "the unpaid balance of the judgment or award from the time that it is entered or made until it is paid, at the annual rate

provided in subdivision 1." Minn. Stat. § 549.09, subd. 2. Owners concedes that it owes Creekview post-judgment interest at a rate of 10% under Minn. Stat. § 549.09, subd. 1(c)(2), but it disagrees with Creekview's request for post-judgment interest in two other ways. *See* Mem. in Opp'n at 26–27. First, it argues it is not fair to make Owners pay interest for the period of time it asked Creekview not to deposit the check while a member of the appraisal panel revisited the appraisal award. *Id.* at 26. The Court need not resolve this objection because Owners states that it "will not quibble with the difference a few weeks makes in that Award," and it does not submit any calculations omitting that period of time from Owners' preferred post-award-interest calculations. *Id.* at 26–27. Second, Owners argues that post-award interest, like pre-award interest, should accrue on actual cash value only, not replacement cost value. *Id.* at 27. For the reasons described above, such a result is not compatible with the Minnesota Supreme Court's decision in *Poehler*, by which this Court is bound. Post-judgment interest is therefore owed on the unpaid balance of the entire appraisal award.

## E

Given the longstanding and frequently reaffirmed authority of the Minnesota Court of Appeals holding that the Minnesota Uniform Arbitration Act applies to the review of appraisal awards, and given that Creekview is the prevailing party in this matter, it is entitled to an award of attorneys' fees, costs, and reasonable litigation expenses under Minn. Stat. §§ 572B.25, 549.02, and 549.04. But under Fed. R. Civ. P. 54(d)(2)(B), the Court will not grant the motion now. That rule provides that, "[u]nless a statute or a court order provides otherwise, the motion [for attorneys' fees] must . . . state the amount sought

or provide a fair estimate of it." Understandably, Creekview has yet to do either. Its request for attorneys' fees, costs, and expenses will be denied without prejudice to Creekview's right to refile when it is prepared to make the required showing.

## ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff Creekview of Hugo Association, Inc.'s Motion to Confirm the Appraisal Award, Enter Judgment, and for Interest, Costs, and Fees [ECF No. 3] is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      The appraisal award's determinations that the actual cash value of the loss is $1,124,515.89 and the replacement cost of the loss is $1,499,354.52 are **CONFIRMED**;

2.      Plaintiff is entitled to recoverable depreciation in the amount of $354,564.68;

3.      Plaintiff is entitled to pre-award interest in an amount to be calculated in accordance with this Order. Within seven days of the date of this Order, Plaintiff must file a revised calculation of pre-award interest consistent with the terms of this Order. If Defendant disputes that calculation, it must file a notice describing its objection within seven days of Plaintiff's filing;

4.      Plaintiff is entitled to post-award interest in the amount of $16,395.20 through March 20, 2019, plus an additional $97.14 per day per day from March 21, 2019, until the entry of judgment; and

5.     Plaintiff's request for attorneys' fees, costs, and expenses is **DENIED**

**WITHOUT PREJUDICE** to Plaintiff's ability to renew that motion at a later time.


Dated:  May 29, 2019                    s/ Eric C. Tostrud
                                        Eric C. Tostrud
                                        United States District Court